**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| D.D. TECHNOLOGY, INC., a Washington corporation,<br><br>    Respondent,<br><br>  v.<br><br>TERRANCE O'CONNOR,<br><br>    Appellant. | No. 88129-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. — Terrance O'Connor appeals the trial court's February 20, 2025 order granting a declaratory judgment in favor of D.D. Technology, Inc. (DDT) enforcing the parties' agreement rescinding his purchase of DDT shares and corresponding interest in the company (the declaratory judgment order) and its July 25, 2025 order dismissing his affirmative defenses and counterclaims against DDT (the dismissal order). Because the trial court properly enforced the rescission agreement but erred in dismissing O'Connor's affirmative defenses and counterclaims despite properly pled allegations that his DDT shares were later restored, we affirm the declaratory judgment order (as construed below), reverse the dismissal order, and remand with instructions to vacate the corresponding judgment and for further proceedings consistent with this opinion.

I

DDT is a Washington corporation that provides mechanical pigging services to decoke and descale fire heaters in refineries and petrochemical plants. Orlande Sivacoe, a Canadian citizen, founded DDT in 1992 and was the sole owner. O'Connor was Sivacoe's lifelong friend and business partner. In October 1996, DDT issued O'Connor a certificate for 500 shares of stock in DDT, which made him a 50 percent owner in DDT. Sivacoe retained the other 50 percent.

Almost two decades later, on August 19, 2015, DDT and O'Connor entered into a rescission agreement rescinding the 500 shares of stock that had been issued to O'Connor in October 1996. The rescission agreement was signed by O'Connor and Sivacoe as president of DDT. Attached to the rescission agreement was a declaration of lost certificate and indemnity agreement signed by O'Connor stating he had lost the stock certificate issued to him in October 1996.

In September 2019, Sivacoe died. Sivacoe's estate entered probate in Canada. O'Connor asserts his 50 percent ownership share of DDT was challenged for the first time by a personal representative of Sivacoe's estate after Sivacoe's death. As a result, he explains, he filed in February 2023 a statement of claim in a Canadian court requesting a declaration that he owns 50 percent of DDT. The Canadian court eventually struck O'Connor's claim because the rescission agreement stated that venue shall be in Skagit County, Washington.

On September 15, 2023, DDT filed a complaint for breach of contract and declaratory judgment against O'Connor in Skagit County Superior Court. The complaint alleged that O'Connor breached the rescission agreement by filing the

statement of claim in Canada asserting an ownership interest in DDT and sought a declaratory judgment regarding the parties' rights under the rescission agreement and declaration of lost certificate. On January 2, 2024, O'Connor answered the complaint, admitting the existence of the rescission agreement and declaration of lost certificate, denying breach of contract, and asserting 13 affirmative defenses.

On March 22, 2024, DDT filed a motion for declaratory judgment, requesting the court declare that (a) O'Connor entered into the rescission agreement wherein he "surrendered any rights or interests he might have claimed as a shareholder" in DDT, (b) the 1996 stock certificate issued to him was cancelled, (c) "the 50% ownership interest he might have claimed was returned to D.D. Technology pursuant to the express terms of the Rescission Agreement," and (d) O'Connor "owns no shares of D.D. Technology." DDT specifically requested an "injunction" against O'Connor "prohibiting him from asserting any legal or equitable claim or purporting to exercise any rights, privileges, or interests in D.D. Technology, which he surrendered in the Rescission Agreement entered into on August 19, 2015." DDT also requested attorney fees.

On February 20, 2025, the trial court held a hearing on DDT's motion for declaratory judgment and, as discussed further below, granted the motion. O'Connor filed a motion for reconsideration on February 28, 2025, which the trial court denied on April 8, 2025. O'Connor then filed a notice of appeal on May 2, 2025, seeking review of the declaratory judgment order and denial of reconsideration. Although both parties agreed the trial court's orders granting

declaratory relief and denying reconsideration were appealable, the appeal was stayed in summer 2025 "pending the trial court's resolution of [DDT's] motion for entry of the judgment."

Meanwhile, on February 7, 2025, O'Connor filed several counterclaims against DDT for breach of contract, contract implied in fact, unjust enrichment, conversion, tortious interference, negligent and/or intentional misrepresentation, corporate waste, and ultra vires action. O'Connor also requested injunctive relief, a declaratory judgment, and damages. On March 31, 2025, DDT filed a motion to dismiss O'Connor's affirmative defenses and counterclaims. On May 5, 2025, DDT filed a motion for entry of judgment and attorney fees, requesting a final judgment that the declaratory judgment order "resolves all claims and counterclaims asserted by the parties" and determining that DDT was the prevailing party. On July 21, 2025, O'Connor filed an "omnibus cross motions, objection, and supplemental response to DDT's motions to dismiss and for attorneys' fees."

Finally, on July 25, 2025, the trial court held a hearing on DDT's motions. The court granted DDT's motion for entry of judgment, entered judgment, and awarded attorney fees. The court also granted DDT's motion to dismiss O'Connor's affirmative defenses and counterclaims. The stay on appeal was then lifted, and O'Connor timely amended his notice of appeal to include these additional orders.

II

A.  The Declaratory Judgment Order

O'Connor argues the trial court erred in granting DDT's motion for declaratory judgment.  We disagree.

Before addressing the parties' arguments regarding the declaratory judgment order, it is necessary to determine the meaning and effect of the order. The parties interpret the order as stating that O'Connor *currently* holds no DDT shares, even *after* the date of the rescission agreement.  That is not what the order says.  It states:

> Pursuant to the terms of the Rescission Agreement executed on August 19, 2015, Defendant Terrance O'Connor surrendered any and all rights or interests he might have claimed as a shareholder in Plaintiff D.D. Technology, Inc., the stock certificate issued to him on October 4, 1996 was cancelled, and the fifty percent (50%) ownership interest in Plaintiff he might have claimed was returned to Plaintiff D.D. Technology, and he owns no shares of D.D. Technology *as of the date of the document*.

(Emphasis added.)  It then states that O'Connor is "estopped from asserting any legal or equitable claim and/or purporting to exercise any rights, privileges, or interests of a shareholder in D.D. Technology*, which he surrendered in the Rescission Agreement and Lost Certificate and Indemnity Agreement also dated August 19, 2015*."  (Emphasis added.)  By its plain terms, the order declares the parties' rights *as of the date of the rescission agreement*.[1]

We next address whether the declaratory judgment order, so construed, accurately declares O'Connor's rights as of the effective date of the rescission

---

[1] Moreover, to the extent the court's subsequent dismissal order expanded the meaning and effect of the declaratory judgment order to establish the parties' rights *beyond* the date of the rescission agreement, the court erred, as discussed in section II.B below.

agreement. Applying the objective manifestation theory of contracts, "we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.,* 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "We impute an intention corresponding to the reasonable meaning of the words used," and we "give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id*. at 503-04. "Where a contract is unambiguous, contract interpretation is a question of law that we review de novo." *State v. Am. Tobacco Co*., 28 Wn. App. 2d 452, 466, 537 P.3d 303 (2023).

The plain language of the rescission agreement is clear that O'Connor rescinded his previous purchase of all his shares in DDT. The agreement states: "Shareholder [O'Connor] requests and offers recission of the purchase of 500 shares of Common Stock in the Company, to be effective immediately, upon execution of this Agreement, and to be retroactive to the original date of issuance, October 4, 1996." The agreement also provides the "basis" for the agreed rescission as follows:

1.2.1. Shareholder was issued Certificate No. 3 for 500 shares of stock in the Company.

1.2.2. Shareholder never paid the consideration, which was $500.00, nor has shareholder ever received any distribution or other benefit from the Company as a Shareholder.

1.2.3. Shareholder has not engaged in any action as a Shareholder, Director, or Officer in the Company; and

1.2.4. Shareholder has never received any compensation for services or distribution of income.

Lastly, the agreement confirms that O'Connor released all claims to his shares of ownership: "Shareholder has held 500 shares of ownership interest in the Company since October 4, 1996, and is hereby releasing *all claims thereto, whether equitable or otherwise*." (Emphasis added.) Thus, the plain language of the agreement makes clear that O'Connor rescinded his previous purchase of all his shares of ownership interest in DDT and released all corresponding claims. The trial court did not err in so ruling.

O'Connor's contrary arguments lack merit. <u>First</u>, O'Connor argues the trial court failed to interpret the rescission agreement in light of extrinsic evidence that the agreement "was not fully integrated or was invalid." To support this argument, O'Connor offers extrinsic evidence including his declaration, DDT tax returns listing him as a stock owner and other corporate records, and representations from DDT's attorney. But he does so not to determine the meaning of specific language in the rescission agreement but rather to contradict or modify the agreement. Specifically, he tries to show that he and DDT intended the rescission agreement as part of a larger, unwritten, and undocumented agreement for the purposes of taxes and/or immigration.

O'Connor cites *Berg v. Hudesman*, 115 Wn.2d 657, 668, 801 P.2d 222 (1990), for the proposition that the rescission agreement should be interpreted using this extrinsic evidence. In *Hearst*, our Supreme Court noted "there has been much confusion over the implications of *Berg*." 154 Wn.2d at 502. The Court then clarified: "Since *Berg*, we have explained that surrounding circumstances and other extrinsic evidence are to be used 'to determine the meaning of *specific words*

*and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" *Id*. at 503 (quoting *Hollis v. Garwall, Inc.*, 137 Wn.2d 695-96, 693, 974 P.2d 836 (1999)). Thus, even if DDT and O'Connor intended a different agreement, "[w]e do not interpret what was intended to be written but what was written." *Id*. at 504. Additionally, the rescission agreement includes an integration clause, which states that the agreement "contains the *entire understanding* of the parties relating to the subject matter thereof." (Emphasis added.) Accordingly, we reject O'Connor's argument that the trial court should have considered extrinsic evidence to contradict or modify the rescission agreement or show a contrary intent.

Second, O'Connor argues the rescission agreement is invalid because it lacked consideration. DDT responds that O'Connor received at least three forms of legally sufficient consideration: (1) the rescission agreement contains an indemnification clause wherein DDT and Sivacoe agree to indemnify O'Connor; (2) the rescission agreement forgave the $500 debt that O'Connor allegedly still owed DDT for the 1996 stock certificate; and (3) the declaration of lost stock certificate states "I hereby request, and this Declaration and agreement of indemnity is made for the purpose of inducing, the Company to cancel the certificate as part of my rescission of purchase." O'Connor claims this consideration is illusory, but fails to prove how that is so as to all three forms of consideration. The agreement did not lack consideration.[2]

---

[2] O'Connor further claims the rescission agreement is unconscionable due to the alleged lack of consideration. Because O'Connor received adequate consideration, his argument that the agreement is unconscionable likewise fails.

Third, O'Connor argues Sivacoe repudiated the contract. As evidence of this alleged repudiation, O'Connor cites to the declaration of his attorney, Christopher Campbell, which he submitted to the trial court after declaratory judgment had already been entered. Campbell states in this declaration that during a telephone conversation with Michael Winslow, former attorney for DDT, "Winslow explained to me that **the original Rescission Agreement was destroyed at the express instruction of Mr. Sivacoe**." But Campbell's declaration contains hearsay that was not confirmed by Winslow's later declaration. *See* ER 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Because O'Connor does not argue any hearsay exception applies, the declaration is not admissible to establish repudiation. *See* ER 802 ("Hearsay is not admissible except as provided by these rules, by other court rules, or by statute."). To establish repudiation, O'Connor also points to tax returns and other records that he claims show his ownership after 2015, but none of these explicitly address the rescission agreement or repudiation. Additionally, as occurred here, "a party cannot repudiate a contract after he has completed his performance under the contract." *Wallace v. Kuchner, 111 Wn. App. 809, 816, 46 P.3d 823 (2002)* (citing *Sethre v. Wash. Educ. Ass'n,* 22 Wn. App. 666, 672, 591 P.2d 838 (1979)). O'Connor fails to show the rescission agreement was repudiated.

Fourth, O'Connor argues the trial court erred in granting DDT's motion for declaratory judgment because there was no justiciable controversy between

himself and DDT regarding the rescission agreement. To be justiciable, a claim must involve (1) an actual, present, and existing dispute, (2) between parties having genuine and opposing substantial interests, (3) which involves interests that must be direct and substantial, and (4) a judicial determination of which will be final and conclusive. *Gull Indus., Inc. v. Granite State Ins. Co.,* 18 Wn. App. 2d 842, 898, 493 P.3d 1183 (2021). The enforceability of the rescission agreement was an actual dispute between O'Connor and DDT, the signatories to the contract, which had genuine and opposing substantial interests regarding the enforcement of the agreement as to which a judicial determination would be final and conclusive. O'Connor's argument focuses on alleged representations made by DDT that O'Connor held a fifty percent interest *after* the date of the rescission agreement, but that is a separate issue, as discussed in section II.B below. There was a justiciable controversy as to the enforcement of the rescission agreement.

Lastly, O'Connor argues Sivacoe's estate was a necessary party. O'Connor cites RCW 7.24.110, which states that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." But in a declaratory judgment matter, this court has stated: "If a complete determination can be had without the presence of other parties, then the right to bring them in is addressed to the sound discretion of the court." *Casey v. Chapman*, 123 Wn. App. 670, 677, 98 P.3d 1246 (2004) (quoting *Williams v. Poulsbo Rural Telephone Ass'n*, 87 Wn.2d 636, 644, 555 P.2d 1173 (1976)). DDT and O'Connor are the only parties to the rescission agreement.

Sivacoe was not a party to the agreement. A complete determination regarding the enforcement of the rescission agreement could be had without the presence of Sivacoe's estate. Joinder of Sivacoe's estate was not necessary.

In sum, the trial court did not err in granting a declaratory judgment in favor of DDT enforcing the rescission agreement and declaring that O'Connor owned no shares of DDT as of the date of the agreement (April 19, 2015).[3]

B.      The Dismissal Order

O'Connor next argues the trial court erred in granting DDT's CR 12(b)(6) motion to dismiss affirmative defenses and counterclaims. We agree.

This court reviews a trial court's order granting a motion to dismiss under CR 12(b)(6) de novo. *Wahkiakum Sch. Dist. No. 200 v. State*, 2 Wn.3d 63, 77, 534 P.3d 808 (2023). Dismissal under CR 12(b)(6) is appropriate if "'it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief.'" *Bowman v. John Doe Two*, 104 Wn.2d 181, 183, 704 P.2d 140 (1985) (quoting *Orwick v. Seattle*, 103 Wn.2d 249, 254, 692 P.2d 793 (1984)). "We presume the facts in the complaint are true and reject the motion to dismiss if '[a]ny hypothetical situation conceivably raised by the complaint . . . is legally sufficient to support the plaintiff's claim.'" *Tavaglione v. Dehkhoda & Qadri, P.C.*, 34 Wn. App. 2d 515, 520, 568 P.3d 1158 (2025)

---

[3] O'Connor further claims that the trial court erred in denying his motion to reconsider the declaratory judgment order. We review a trial court's ruling on a motion for reconsideration for abuse of discretion. *See Hockett v. Seattle Police Dep't*, 31 Wn. App. 2d 210, 219, 548 P.3d 271 (2024). O'Connor's motion for reconsideration repeated the same arguments he made in his prior briefs and those he makes on appeal. For the reasons stated above, the trial court did not abuse its discretion (nor did it err) in denying reconsideration.

(quoting *Jackson v. Quality Loan Serv. Corp. of Wash.*, 186 Wn. App. 838, 843, 347 P.3d 487 (2015)).

Critical here, O'Connor's counterclaim against DDT alleges that he possesses, as of the date of the counterclaim (February 7, 2025), "an equal interest . . . that has continuously included, *and presently includes*, entitlement to assets, revenues, and proceeds derived therefrom." (Emphasis added.) Consistent with this allegation, O'Connor argued in the trial court below that his 50 percent ownership interest in DDT was "restored" and maintained "after" the August 19, 2015 effective date of the rescission agreement. O'Connor also referenced the earlier declaratory judgment proceedings, wherein he asserted: "After August 19, 2015, I continued my involvement with Plaintiff as Director and Owner. I continued to operate in my shareholder capacity and continued to be recognized by the corporation as 50% owner in operations, tax filings, business dealings, financial investments and obligations, corporate actions and other corporate functions."[4] Thus, the allegations of the counterclaim and O'Connor's properly alleged and hypothesized facts establish for purposes of deciding DDT's motion to dismiss that O'Connor *currently* has an ownership interest in DDT.

Turning to O'Connor's defenses and counterclaims, O'Connor asserted numerous affirmative defenses to DDT's claim that he breached the rescission agreement when he filed a notice of claim in the Canadian court, almost all of which

---

[4] Although O'Connor also asserted that his allegation that he currently owns 50 percent of DDT was supported by "testimony and other admissible evidence," the trial court could not properly consider that evidence without converting DDT's CR 12(b)(6) motion into a summary judgment motion under CR 56(c). *See Watkins v. ESA Mgmt., LLC*, 30 Wn. App. 2d 916, 922, 547 P.3d 271 (2024). Here, we consider O'Connor's declaration only insofar as it sets forth a hypothetical situation that is conceivably raised by his counterclaim and is legally sufficient to support his claims and affirmative defenses. *See Tavaglione*, 34 Wn. App. 2d at 520 (quoted in the text above).

are contract-based defenses. And he also asserted against DDT numerous counterclaims, which can be categorized as follows: (1) contract-related claims, including breach of contract implied in fact and contract implied in law; (2) tort-based claims, including tortious interference, conversion, and negligent and/or intentional misrepresentation; and (3) shareholder-based claims, including corporate waste and ultra vires action. The trial court dismissed the counterclaims as "moot," presumably referring to its contemporaneous ruling (in its order granting DDT's motion for entry of judgment entered the same day) that the declaratory judgment order "resolves all claims and counterclaims asserted by the parties in this action." That is the only basis provided for granting DDT's motion. But if O'Connor's shares were restored after the effective date of the rescission agreement, as he alleges, the resulting stock ownership could be sufficient to defeat DDT's claim that O'Connor breached the rescission agreement when he filed the claim alleging ownership in Canada and support some or all of O'Connor's corresponding counterclaims. Thus, it does not appear beyond doubt that O'Connor can prove no set of facts, consistent with his asserted defenses and counterclaims, which would entitle him to relief.

In sum, the trial court erred in granting DDT's CR 12(b)(6) motion to dismiss O'Connor's affirmative defenses and counterclaims.

III

For the above reasons, we affirm the declaratory judgment order as construed herein and the trial court's related order denying O'Connor's motion for reconsideration, reverse the dismissal order, and remand with instructions to

- 13 -

vacate the corresponding judgment (including the award of attorney fees and costs in DDT's favor) and for further proceedings consistent with this opinion.[5]

_Feldman, J._____

WE CONCUR:

_____, ACJ          _Mann, J._____

---

[5] DDT also requests fees on appeal.  Because we vacate the trial court's award of attorney fees in DDT's favor and remand that issue to the trial court, DDT's request for attorney fees on appeal is premature.  The trial court may consider this issue on remand and award attorney fees incurred in this appeal if and when appropriate to do so.  We otherwise express no opinion regarding the parties' entitlement to attorney fees in litigating this matter.